1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10

11   FRANCISCO J. HERNANDEZ,                    Case No.  16-02521 BLF (PR)

                    Petitioner,
12                                              **ORDER DENYING PETITION FOR**
                                                **WRIT OF HABEAS CORPUS;**
13        v.                                    **DENYING CERTIFICATE OF**
                                                **APPEALABILITY**
14   WILLIAM L. MUNIZ, Warden,

15                    Respondent.

16

17

18        Petitioner has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. §

19   2254 challenging his state conviction.  Respondent filed an answer on the merits.  (Docket

20   No. 18.)  Petitioner filed a traverse.  (Docket No. 26.)  For the reasons set forth below, the

21   Petition for a Writ of Habeas Corpus is **DENIED**.

22

23                              **I.  BACKGROUND**

24        On March 12, 2012, Petitioner was found guilty by a jury in Alameda County

25   Superior Court of murder of Marco Casillas, the premeditated attempted murder of Janett

26   Mendoza, and assault with a firearm.  (Ans. at 1.)  The jury found true personal use of a

27   firearm enhancements causing great bodily injury and that the three charges were

28   committed for the benefit of a criminal street gang.  (*Id.*; Clerk's Transcript ("CT") at 307-

310, 426-419, Ex. 1; Reporter's Transcript ("RT") at 1696-1702, Ex. 2.[1])  On May 4, 2012, the trial court sentenced Petitioner to an aggregate term of 75 years to life in state prison. (CT 429-435.)

Petitioner appealed to the California Court of Appeal, (Ex. 3), and concurrently filed a state habeas petition, (Ex. 5).  The direct appeal was consolidated with the habeas action.  (Ex. 4.)  On October 28, 2014, the appellate court denied the petition and affirmed the judgment in a lengthy, reasoned opinion.  (Ex. 6.)

After the petition for rehearing was denied, (Exs. 7, 8), Petitioner sought review in the California Supreme Court.  (Ex. 10); *see also* Pet. Ex. A.  The court denied review on February 11, 2015.  (Ex. 9.)

Petitioner filed the instant habeas petition on May 10, 2016.

## II. STATEMENT OF FACTS

The following background facts are from the opinion of the California Court of Appeal on direct appeal:

A.    *Prosecution's Case*

1.    *Murder of Marco Casillas and Attempted Murder of Janett Mendoza*

Around 10:30 p.m. on September 19, 2008, 20-year-old Janett Mendoza and her fiancée Marco Casillas, also 20 years old, went out to walk Mendoza's dog.  Neither Mendoza nor Casillas had any gang affiliations.  However, Casillas, who loved hats, was wearing a red Phillies baseball cap.  To defendant, an avowed Sureño gang member, affiliated with the South Side Locos (SSL) subset, anyone wearing the color red was considered an enemy.

Mendoza saw a white car parked at the corner and she heard "huffing and puffing."  She asked Casillas if someone was being chased.  Casillas partially turned around and told her, "Baby, the guy behind us has

---

[1] All references herein to exhibits are to the exhibits submitted by Respondent in support of the answer, unless otherwise indicated.  (*See* Docket No. 19.)

2

a big gun." Mendoza then heard gun shots. As she turned around, she came face to face with defendant, who was wearing a black hoodie and jeans. Defendant had a "big gun" in his hands, which Mendoza noted had "wood" in it. Mendoza's focus was on defendant's face, which she could see clearly. Nothing obstructed her view of defendant. She was approximately 16 feet from defendant when she first turned around and saw him with the gun. Though it was nighttime, the area was illuminated by the streetlights, a house light, and by the gun fire itself.

Mendoza kept her eyes on defendant as he was shooting the gun at Casillas. She looked directly at this face for approximately 20 seconds. During this time, she had a "good view" of defendant and could clearly see his face. Mendoza testified that seeing defendant's face for those 20 seconds, left a "lasting impression" on her. Mendoza "vividly" recalled defendant's face. She described him as a male Latino, chubby build, between 5'6" and 5'8", with a closely tapered hairstyle, and a thin line of facial hair from his lip to his chin. What stood out the most for her were defendant's "eyebrows and his eyes."

After shooting Casillas, defendant turned the gun on Mendoza. Mendoza testified that even after being shot and falling to the ground, she still had a clear view of defendant's face. Mendoza was "100 percent sure" that defendant was the person who shot her and Casillas.

Mendoza was hospitalized for months, underwent more than five surgeries, and was not released until just before Thanksgiving of 2008. Most of what she remembers about her time in the hospital was being in pain and "pretty out of it," from the medication. She had no recollection of speaking with Sergeant James Rullamas while she was in the hospital. She was not given any information about the case and was not shown any photographs until after she was released from the hospital.

2.    *Police Investigation and Photo Identification of Defendant*

Sergeant James Rullamas was assigned to investigate the shootings. He had been with the Oakland Police Department since 1992 and had been a homicide inspector since 2001, investigating between 150 and 175 homicides at the time of the charged crimes. Casillas was pronounced dead shortly after 11 p.m. on the night of the incident.

Two days after the shootings, it was still unclear whether Mendoza would survive. Sergeant Rullamas went to the hospital to see her but was unable to get any statement. He went back several days later, but Mendoza was too heavily medicated and he abandoned any attempt to get a statement. At this visit, Mendoza said the shooter had an "average build."

3

Sergeant Rullamas began to receive word about the shootings several days later. On September 24, he received an anonymous tip that "Bandit" was the shooter, and that the shooting was gang-related. That same day, Sergeant Rullamas spoke with Mendoza's mother, Sandra Reyes, who stated that a man may have been following her, and that he was holding what appeared to be a rifle. Sergeant Rullamas put together a photo lineup and Reyes identified defendant's cousin, Manuel Hernandez. [FN3] Manuel's street name was "Bandit."

FN3. To avoid confusion with defendant, we shall refer to Manuel Hernandez, as "Manuel" or "Bandit."

Sergeant Rullamas requested that officers find Bandit and arrest him for weapons possession. Later that evening, police located Bandit during a traffic stop. The driver of the car was Fernando Ulloa. Bandit and defendant were passengers.

Following the automobile stop, all three occupants, including defendant, were brought to the station for interviews. Defendant was wearing a black hoodie and had a thin line of facial hair from his lip to his chin. Defendant had a blue bandana and several gang-related writings in his possession at the time of the traffic stop. The writings were copied and the property was returned to defendant following his interview.

In the early morning hours of September 25, homicide investigation George Phillips learned that defendant was in an interview room at the station. Officer Phillips was investigating "an incident and hoped [defendant] could provide some information." Defendant was not under arrest at the time he met with Officer Phillips. The interview was recorded and a portion of it was played for the jury.

During the interview, defendant said that he was known as "Zapper," and admitted that was a current member of SSL and had been with SSL for about six years. Defendant said that he had gone to Lazear elementary school, and that he went to a continuation high school because he got into too many fights. Bandit was his cousin.

On September 26, Sergeant Rullamas received an email from Mendoza's cousin, Elizabeth Torres, with photographs and links to defendant's MySpace page. The links showed numerous gang writings and showed defendant holding a revolver to his head with the caption, "We are at war now."

On October 6, Victor Ayala, a former SSL member, called the Oakland Police Department, advising them that he had discovered a rifle in a garbage can outside of his apartment. The responding officer conducted a probationary search of Ayala's apartment, [FN4] which revealed ammunition for a .38 caliber handgun and an assault rifle in the closet. An additional .38 caliber handgun was found in Ayala's car. Ayala was arrested. The assault rifle obtained from Ayala was later determined to be the weapon used in the shootings that killed Casillas and severely wounded Mendoza.

FN4. Ayala's wife was on probation.

On December 1, Sergeant Rullamas interviewed Mendoza at the police station, where she provided a very detailed description of the shooter, stating that he was a 19 to 22 year old Latino male, chubby or even very heavyset (250 pounds plus), 5' 8", with a round face and a thin strip of hair down his chin. Sergeant Rullamas was aware that this fit the description of defendant, aka Zapper. Unlike her time in the hospital, Mendoza was now coherent and articulate. She was absolutely certain she could identify the shooter.

With the assistance of a computer matching program, Sergeant Rullamas prepared a photo lineup that included defendant's picture. He selected photographs to ensure that defendant was not the youngest, nor the oldest, nor the heaviest, nor the lightest. All of the potential suspects had facial hair, but Sergeant Rullamas admitted that matching the thin strip down the chin was difficult.

Mendoza, after receiving the standard admonition regarding photo lineups, identified defendant's photograph right away. She selected defendant's photo within seconds and was very emotional. Prior to this time, she had never been shown any photographs of defendant.

Thereafter, Sergeant Rullamas obtained a warrant for defendant's arrest and to search various social networking sites he frequented. Defendant's MySpace page had significant gang-related language, it appeared that the page had been cleaned. The page listed defendant's occupation as "Busta killa homie." Sergeant Rullamas obtained the MySpace photos which contained numerous references to Zapper and to SSL. A subsequent search of defendant's residence contained more of the same, as did the phone he was carrying at the time of his arrest.

///
///
///

5

### 3. *Gang Evidence*

Defendant is a self-admitted Sureño member within its sub-sect, SSL. He was housed in the Sureño unit of the Santa Rita County Jail upon his arrest. He had numerous gang tattoos and even had his eyebrows trimmed and shaved to resemble SSL.

Gang expert Douglass Keely testified that defendant was a "shotcaller" – a high ranking and experienced member – of SSL. After giving general information about local Oakland gangs and the rivalry between the Sureños, Norteños and Border Brothers, Keely described how SSL is the main crew of the Sureños in Oakland, with approximately 30 to 50 members. Because they are so heavily outnumbered by the rival Norteños, they are forced to become much more violent in order to gain respect, to promote the gang's purposes, and to recruit new members. The gang readily possesses and passes firearms from member to member as needed to provide weapons and to protect those who have recently used them from discovery. Keely explained the concept of "gang guns" in which the weapons are shared rather than owned by individual members.

Keely described the primary purposes of SSL as encompassing murder, attempted murder, shootings and assaults, and illegally carrying concealed or loaded weapons. He further described specific offenses committed by SSL members and how he had observed defendant and other members of SSL posing for pictures in gang clothing on Cinco de Mayo. During a recent search of a gang residence, Keely had personally observed photographs of defendant and other SSL members holding large rifles, captioned with gang slogans including SSL, VL (Varrio Loco) and "Chap Killer." [FN5]

> FN5. Keely explained that "chap" is short for "chapeto," which is a derogatory name for a Norteño.

Keely testified that killing equates to respect for gang members, that members will go "'hunting'" for rivals, generally in packs to validate kills, and how they did not hunt for specific persons, but only for specific targets. He explained how a shotcaller from the gang will go hunting with less experienced members to set an example for them, and how this was called "putting in work." He testified that a person wearing a red hat in Norteño territory is likely to become a target, regardless of whether they are actually a gang member. Keely opined, based on a hypothetical with facts similar to the instant case, that the shootings were committed for the benefit of SSL.

Keely was aware of the investigation in the present case and described the gang connections among numerous people mentioned during

6

trial. He described the area encompassing the shooting as Norteño territory. He further described Bandit's residence as an SSL safe house, how his mother even supports Bandit's gang activities, and how his neighbors began complaining of vandalism and gang activity soon after they moved in.

Keely was present on December 29, 2008, when defendant was arrested for the instant shootings. Defendant was seated in the backseat of a Nissan with other gang members inside or around it. Keely collected gang indicia from the Nissan, specifically "[s]ome CDS with… [SSL] gang graffiti [on them] and a blue belt."

Keely was also responsible for the search of defendant's residence. Prior to entering the residence, Keely noticed that SSL had been spray painted on the ground. Inside the residence, officers found a rifle and a black folder with gang writing in it. Much of the writing had defendant's gang moniker "Zapper" scrawled all over it and contained what appeared to be handwritten rap lyrics of a very violent nature. The writings also specifically referenced use of AK-47's and 30-round clips such as were used in the present shooting. The writings also referenced the Sureños practice of not committing drive-by shootings; instead getting out of the car and firing face to face.

The writings discussed defendant's gang lifestyle and loyalty to the "South Side." For example, defendant had written rap lyrics found at his mother's place with the name "Zapper" on it stating the following: "'Blue rag up 2the fuckin sky from the 14 Bay east Side Bangin SOUTH Fuck north SIDE, that's right.' [¶]… 'Stop before you get pop[p]ed'… [¶] 'You gone shoot back I think not. I'm aim 2 the top. Blue rag 2 show what I'm dissin enemies. Listen all my homies bumpin'… 'This is how my homies kill.' 'Unload the clip chapetes.' 'We just drive around killing chaps. Ask Zapper from SSL'… 'They call me Zapps. I love 2 kill chaps. That's my thing.' 'I'll kill your wife, your family, and your mothafucking friends. I keep my blue rag on my left cause the right way is wrong, my rifles are long.' 'I'm SSL saying fuck BB and Norte.'… [¶] 'I hang not just me my homies. We blast with shot guns 9s and 22s.' 'Where we pack AKs Homie say something you got spray East Bay were we blue rag all day.'… [¶]… [¶] 'South side locos gang we known 2 get wild.' 'SSL click.'… [¶] 'SSL click we causeing trouble. 9 milla an extra clips on the doble for talking shit. End up in a red puddle and this for reals you a Chapeta you blood gon spill Zapper Loco Quick 2 kill.'… 'I keep it blue… I'm SSL savage.' 'All I do is fuckin shoot busters in caskets.' 'We destroy all chaps.' 'They get sprays.' 'SSL do play. We just drive around killin busters.'"

Again referencing himself as "'Zapper from Da SSL,'" defendant writes: "'I got A 30 round clip bullets I got a chopper' [FN6]… 'SSL click we causeing trouble. 9 milla an extra clips on the doble for talking shit. End up in a red puddle and this for reals you a Chapeta you blood gon spill Zapper Loco Quick 2 kill'… 'I smoke people like ice, serving foo like I was nice thanks God that's not the case.' Zapper Loco with three dot on my face.'"

FN6. Keely explained that "choppers" are "machine guns, AK 47s."

### 4. Forensic Evidence

Ballistics experts matched the eight casings found at the scene with the AK-47 recovered from Ayala's residence. Ayala was known as "Trucho."

### B. Defense Evidence

Several friends and relatives testified that defendant was at home the entire evening of September 19th.

Defendant presented testimony from Robert Shomer, Ph.D., an expert in the field of eyewitness identification. Dr. Shomer testified to various problems related to the accuracy of eyewitness identifications.

*People v. Hernandez*, Nos. A135426, A138001, slip op. at 2-8 (Cal. Ct. App. Oct. 28, 2014); (Ex. 6, hereinafter "Op.").

## III. DISCUSSION

### A. Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2)

resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"; rather, that application must also be unreasonable. *Id*. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id*. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id.*

The California Court of Appeal, in its opinion on direct review, addressed the claims raised in the instant petition. (*See* Ex. 6.) The Court of Appeal thus was the highest court to have reviewed that claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

**B.    Claims and Analysis**

Petitioner asserts the following grounds for relief: (1) trial counsel rendered ineffective assistance based on various failings; (2) admission of the "over the top gang" evidence deprived him of due process and a fair trial; (3) the trial court violated his right to due process and a fair trial by failing to remove Juror 30 who could no longer be fair and impartial; (4) prosecutorial misconduct; (5) the trial court violated his right to due process to present a defense when it foreclosed defense counsel from asking his expert witness certain questions; and (6) cumulative prejudice.  (Pet. Ex. A at i-iii, original pagination.)

### 1.    Ineffective Assistance of Counsel

Petitioner claims that trial counsel rendered ineffective assistance based on several failings: (a) stipulating to the admission of evidence obtained in violation of his Fourth Amendment rights; (b) deficient performance with respect to eyewitness identification; (c) failure to move to excuse Juror 30; (d) failure to object to the prosecutor's misconduct; and (e) failure to object to the admission of any gun other than the weapon used against victims.  (Pet. Ex. A at 6, 10, 21, 26, 36, original pagination.)

Petitioner must establish two things in order to prevail on a Sixth Amendment ineffectiveness of counsel claim.  *See supra* at 19.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies.  *Id.* at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether counsel's conduct was deficient after determining that petitioner could not establish prejudice), *cert. denied*, 516 U.S. 1124 (1996).

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See id.* at 200-202; *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (same). The general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

### a. Failures in Stipulating to the Admission of Evidence

Petitioner claims that counsel was ineffective when he stipulated to the admission of evidence that was obtained in violation of the Fourth Amendment, specifically a portion of the recorded interview at the police station, a blue bandana and papers taken off his person during the traffic stop of "Bandit," and evidence obtained from the search of his residence. (Pet. Ex. A at 6.)

During a traffic stop on September 25 of Bandit, Petitioner, as passenger in the car, was taken to the station for an interview. *See supra* at 4. The fact that Petitioner had a blue bandana and gang-related writings in his possession at the time was admitted into evidence at trial. *Id.* Petitioner argues that these items could not reasonably be mistaken for weapons and therefore could not be seized pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968),[2] and that therefore counsel was ineffective for failing to move to suppress this

---

[2] The following is taken from the state appellate court opinion:

> Under Terry, "'when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently

11

evidence. Respondent argues that although the state court agreed that seizure of these items exceeded the scope of *Terry*, the court reasonably found that "given the plethora of other, more incriminating gang-related evidence, the failure to move to suppress the evidence from the traffic stop – the blue bandana and gang-related writings – did not prejudice defendant." (Op. at 25.)

In order to establish ineffective assistance of counsel based on defense counsel's failure to litigate a Fourth Amendment issue, petitioner must show that: (1) the overlooked motion to suppress would have been meritorious, and (2) there is a reasonable probability that the jury would have reached a different verdict absent the introduction of the unlawful evidence. *Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)).

The state court's rejection of this claim was not unreasonable. The evidence of Petitioner's gang membership was overwhelming: he was a self-admitted member of the SSL, *see supra* at 6; he had numerous gang tattoos and even had his eyebrows trimmed and shaved to resemble the letters "SSL," *id.*; and even his mother admitted he was a gang member, (RT 1200-02). Furthermore, as Respondent points out, because of the gang enhancement, there was a host of admissible evidence showing Petitioner's hatred of rival gangs and the violent nature of SSL. (Ans. at 8; RT 961-65, 977-79, 997-1002, 1049-61, 1066-76.) Even if the Court assumes that a motion to suppress would have been meritorious, Petitioner has failed to establish that the jury would have reached a different

---

dangerous to the officer or to others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.' [Citation.] 'The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence….' [Citation.] Rather, a protective search – permitted without a warrant and on the basis of reasonable suspicion less than probable cause – must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.' [Citations.] If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed. [Citation.]" (Minnesota v. Dickerson (1993) 508 U.S. 366, 373.)

(Op. at 25-26.)

verdict absent the introduction of these gang-related items in light of the other overwhelming evidence of his gang affiliation. *See Ortiz-Sandoval*, 323 F.3d at 1170. Put another way, Petitioner has failed to show that but for counsel's failure, the result of the proceedings would have been different. *See Strickland*, 466 U.S. at 694. As such, this claim is without merit.

Next Petitioner claims that the state court unreasonably rejected the claim that counsel rendered ineffective assistance for stipulating to the admission of, rather than moving to suppress, his interview at the police station on the day of Bandit's traffic stop because his removal was a de facto arrest without probable cause.

The Court of Appeal rejected this claim on appeal:

> Defendant claims that he was under de facto arrest when the police removed him from the mini-van, searched him for weapons, handcuffed him and transported him to the police station. According to defendant, probable cause did not support his de facto arrest. And, as such, his interview with police, along with the video and still photographs from that interview, which depict his distinct facial hair, would have been excluded had defense counsel moved to suppress this evidence. We disagree.

> "'There is no hard and fast line to distinguish permissible investigative detentions from impermissible de facto arrest. Instead, the issue is decided on the facts of each case, with focus on whether the police diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly, using the least intrusive means reasonably available under the circumstances.' [Citations.] Important to this assessment, however, are the 'duration, scope and purpose' of the stop." (*People v. Celis* (2004) 33 Cal.4th 667, 674-674 (*Celis*).)

> The length or brevity of the stop is a critical factor in this assessment. (*Celis, supra*, 33 Cal.4th at p. 675.) As to the scope of the police intrusion, *Celis* observes that "stopping a suspect at gunpoint, handcuffing him, and making him sit on the ground for a short period,… do not convert a detention into an arrest. (See *People v. Soun* (1995) 34 Cal.App.4th 1499, 1517 [detention when the defendant 'was removed from the car at gunpoint by a large number of police officers, was forced to lie on the ground, was handcuffed and placed in a patrol car, was transported from the site of the stop a distance of three blocks to a parking lot,' where he was held for 30 minutes]; *In re Carlos M.* [1990] 220 Cal.App.3d [372] at p. 384 [detention when the defendant was handcuffed and transported to

hospital for identification by rape victim; 30-minute duration]; *Haynie v. County of Los Angeles* (9th Cir. 2003) 308 F.3d 987, 991 [driver stopped a gunpoint and ordered out of his truck, handcuffed and held in a patrol car for between 45 and 60 minutes was detained, not arrested]; *United States v. Alvarez* (9th Cir. 1990) 899 F.2d 833, 838-839 [investigative detention when the defendant forced at gunpoint to get out of his car]; *United States v. Buffington* (9th Cir. 1987) 815 F.2d 1292, 1300 [no arrest when driver was stopped at gunpoint, ordered out of car and forced to lie on the ground]; *United States v. Bautista* (9th Cir. 1982) 684 F.2d 1286, 1289 [handcuffing did not convert detention into arrest]; but see *People v. Campbell* (1981) 118 Cal.App.3d 588, 595-596 [the defendant functionally under arrest when police at an airport stopped him at gunpoint, handcuffed him, and took him to an office for questioning; restraint went beyond that 'reasonably necessary for a detention'].)" (*Celis*, *supra*, at p. 675.)

Viewed in the context of these authorities, the brief and minimally intrusive restraint on defendant's freedom of movement, while he was handcuffed and transported to the station, did not rise to the degree associated with a formal arrest. Moreover, although it appears that defendant was at the police station for several hours before he was released, nothing in the record suggests that the otherwise investigative detention transmogrified into a formal arrest. Accordingly, defense counsel was not ineffective in failing to move to suppress the challenged evidence.

(Op. at 26-28.)

The state appellate court's rejection of this claim was not unreasonable because Petitioner has failed to establish prejudice, i.e., that there is a reasonable probability that the jury would have reached a different verdict absent the admission of the interview. Officer Phillips, who conducted the interview, testified that he obtained mostly background information, e.g., name, where Petitioner grew up and if he had any children or siblings. (8 RT 828-829.) The only specific information from that interview that was mentioned during direct examination was Petitioner's school history within the Oakland Unified School District. (8 RT 830.) Therefore, even if the information obtained from the interview had been suppressed, there is no reasonable probability that the jury would have found Petitioner not guilty of the charges. *See Strickland*, 466 U.S. at 694. Accordingly, this claim is without merit.

///

Petitioner next argues that counsel was ineffective for failing to move to suppress evidence found during a warrant search of Bandit's residence.  The state appellate court rejected this claim on appeal after a lengthy discussion:

> ### 4.    Search of Residence
>
> Defendant next contends that defense counsel was ineffective in failing to move to suppress the evidence found in Bandit's residence because Sergeant Rullamas lacked sufficient probable cause to justify the search.  We disagree.
>
> In his supporting search warrant affidavit, Sergeant Rullamas averred there was probable and reasonable cause to issue a search warrant based on the following facts: On the evening of September 19, 2008, he was working as an investigator with the Oakland Police Department homicide unit, when he was called to respond to a homicide.  He spoke with a patrol officer who advised him that there had been a double shooting, where a male had been shot several times and was in critical condition.  The only other information the officer had was that the suspect apparently had driven up and "fired upon the victims with an assault rifle."
>
> Sergeant Rullamas further attested that on September 21, 2008 he discussed the case with Officer G. Melero from the police department's gang unit.  Officer Melero told Sergeant Rullamas that "a reliable confidential informant, with whom he has successfully worked with for years, told him that word on the street is that a person with a nickname of Bandit is the killer."  The informant, however, did not actually witness the crime.  Officer Melero told Sergeant Rullamas he knew Bandit's real name was Manuel Hernandez and that he was a high ranking Sureño gang member.
>
> Sergeant Rullamas also attested that on September 23, 2008, he received an anonymous call from a person who said a man known as "'Bandit'" is the shooter in this case."  The caller told Sergeant Rullamas that Bandit shot the victims because Mendoza's brother is a Norteño gang member.
>
> Sergeant Rullamas further attested that he spoke with Mendoza's mother, Sandra Reyes, who said that as she was walking down her street, she saw a car in a nearby intersection with a man holding what appeared to be a rifle.  Reyes explained that she was able to see the barrel of the firearm sticking up about six inches from the base of the window, as if the butt of

15

the gun were on the floorboard with the barre[l] pointed straight forward. Reyes picked out Bandit from a photo lineup.

After his interview with Reyes, Sergeant Rullamas discussed the case with Officer C. Bunn, who then emailed Sergeant Rullamas five photographs – one depicting Bandit holding what appears to be a sawed-off shotgun, and another three showing him displaying gang signs.

Based upon the above information, Sergeant Rullamas met with the gang task force unit and requested they arrest Bandit on suspicion of possessing an assault rifle. Following Bandit's arrest, Sergeant Rullamas verified Bandit's address and requested a search warrant for firearms and gang paraphernalia.

In deciding whether the search warrant affidavit establishes probable cause, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983) 462 U.S. 213, 238.) In other words, "'[i]n determining the sufficiency of an affidavit for the issuance of a search warrant the test of probable cause is… whether the facts contained in the affidavit are such as would lead a man of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion of the guilt of the accused.' [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1041.)

Reliability is but one element of the probable cause determination. "[A]n informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of his [or her] report…. [T]hese elements… should be understood… simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." (*Illinois v. Gates*, *supra*, 462 U.S. at p. 230.) "It is well settled that information from an untested or unreliable informant does not establish probable cause unless it is 'corroborated in essential respects by other facts, sources or circumstances.'" (*People v. Maestas* (1988) 204 Cal.App.3d 1208, 1220.) Also entitled to credit is an informant who provides a large amount of detailed, firsthand information. (See *People v. Foster* (1988) 201 Cal.App.3d 20, 24.) The affidavit must also provide probable cause to believe the material to be seized is still on the premises to be searched when the warrant is sought. (*People v. Cooks* (1983) 141 Cal.App.3d 224, 298, citing *People v. Mesa* (1975) 14 Cal.3d 466, 470.)

Probable cause is less than proof beyond a reasonable doubt, less than a preponderance of the evidence, and less than a prima facie showing. (*People v. Tuadles* (1992) 7 Cal.App.4th 1777, 1783.)  A reviewing court does not conduct a de novo review of the sufficiency of the affidavit and must accord great deference to a magistrate's finding of probable cause. (*People v. Aho* (1985) 166 Cal.App.3d 984, 991; *Illinois v. Gates*, *supra*, 462 U.S. at p. 236.)  Doubtful or marginal cases should be resolved in favor of upholding the warrant.  (*U.S. v. Ventresca* (1965) 380 U.S. 102; *People v. Superior Court* (*Corona*) (1981) 30 Cal.3d 193, 203-204; *People v. Mikesell* (1996) 46 Cal.App.4th 1711, 1716.)

The challenged search was conducted pursuant to a warrant and is therefore presumed to be reasonable under the Fourth Amendment. "Searches supported by a warrant are presumed reasonable, and the defendant must prove the contrary."  (*People v. Contreras* (1989) 210 Cal.App.3d 450, 454.)  A "magistrate's determination will not be overturned unless the supporting affidavit fails as a matter of law to support the finding of probable cause.  [Citations.]"  (*Fenwick & West v. Superior Court* (1996) 43 Cal.App.4th 1272, 1278.)

Here, looking at the totality of the circumstances, there was more than sufficient information to establish probable cause to issue the warrant. The affidavit, signed by Sergeant Rullamas recited that, as an officer with Oakland Police Department, he had "investigated thousands of crimes," and had received formal and informal training from experienced criminal investigators.  Sergeant Rullamas then recited the probable cause information.  He explained that he spoke with Officer Melero from the gang unit, who established the reliability of the confidential informant.  If an informant has provided accurate information on past occasions, he or she may be presumed trustworthy on subsequent occasions.  (See, e.g., *People v. Dumas* (1973) 9 Cal.3d 871, 876.)  Sergeant Rullamas also indicated that although the confidential informant did not witness the crimes, the informant knew that Bandit was "feeling pressure from both the Sureños and Norteño gang members, because the victims were not gang members and had no prior criminal history."

In such a case, there is no requirement for strict corroboration of the information; the court need only conduct a "practical, nontechnical" review of the circumstances.  (*People v. Hansborough* (1988) 199 Cal.App.3d 579, 584.)

Veracity also may be demonstrated through independent police corroboration of the information provided.  (*People v. Terrones* (1989) 212 Cal.App.3d 139, 146-147.)  *People v. Rochen* (1988) 203 Cal.App.3d 684, 687-688.)  For example, in *People v. Rochen*, *supra*, 203 Cal.App.3d 684, a

police officer's affidavit stated he had learned from an informant that a woman named Nellie sold drugs from her home. The informant gave the officer Nellie's telephone number, and when the officer dialed the number a female answered and identified herself as Nellie. The female agreed to sell drugs to the informant. The court held this was sufficient corroboration of the informant's statements, even though there was no verification that Nellie lived at the address in question. It stated: "The purpose served by corroboration is 'to establish that the information provided by the informant did not constitute a made-up story, one fabricated out of whole cloth. Corroboration of part of the information provided by the informant [gives] credibility to the remainder of the information.' [Citations.]" (*People v. Rochen*, *supra*, 203 Cal.App.3d at p. 689.)

Here, similarly, it was not necessary to provide independent corroboration of each fact in the confidential informant's statements to establish probable cause. In addition to the information provided by the confidential informant, Sergeant Rullamas received an anonymous call from a person who said that Bandit was the shooter.

Sergeant Rullamas also interviewed one of the victim's mother[s], who identified Bandit in a photo lineup as the person who was driving down her street with a rifle sticking out of a car window.

Regarding basis of knowledge, the affidavit recited that the confidential informant had successfully worked with Officer Melero for years and that Officer Melero had closely interacted with members of the local Hispanic gangs.

This information, considered in conjunction with the other information in the affidavit, was sufficient to allow the magistrate to make an informed probable cause determination. Thus, the lack of corroboration claimed by defendant was not fatal because it did not cast doubt on the main factors in the totality of circumstances test: the confidential informant's veracity and the basis of his or her knowledge. In other words, the totality of the circumstances was sufficient to support the magistrate's conclusion that there was a fair probability of criminal activity on the premises named in the affidavit. (*Illinois v. Gates*, *supra*, 462 U.S. at p. 238.) Defense counsel, therefore, did not render ineffective assistance by failing to move to quash the search warrant and to suppress the evidence.

Separately and alternatively, however, even assuming there was an insufficient showing of probable cause, we conclude that the search was saved by the so-called "good-faith" exception to the exclusionary rule. Under the exception, exclusion is not required "where police officers act in objectively reasonable reliance on a search warrant that is issued by a

detached and neutral magistrate but is later found to be invalid for lack of probable cause…." (*People v. Willis* (2002) 28 Cal.4th 22, 30.) However, "the good faith exception does not apply 'where the issuing magistrate wholly abandoned his judicial role,' where the affidavit was "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" or where the warrant was 'so facially deficient – *i.e.*, in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid.' [Citation.] Thus, courts must determine 'on a case-by-case basis' whether the circumstances of an invalid search pursuant to a warrant require the exclusionary rule's application. [Citation.]" (*Id.* at p. 32, quoting *United States v. Leon* (1984) 468 U.S. 897, 923, 918.)

Defendant argues that the affidavit was so lacking in probable cause that a reasonable officer would not have presumed it to be valid. We disagree. A reasonably well-trained officer would have believed the affidavit provided a substantial basis for finding probable cause. The confidential informant had provided reliable information in the past and had knowledge that Bandit was the shooter. The confidential informant explained that Bandit was "feeling pressure" from both the Sureños and the Norteños because the victims were not gang members. The information was corroborated by an anonymous caller. Sergeant Rullamas's independent investigation revealed that Bandit was a gang member and that he had been seen driving near the crime scene pointing a rifle at one of the victim's mothers. Hence, Sergeant Rullamas's conclusion that firearms and gang-related paraphernalia would be found at Bandit's residence was by no means unreasonable.

Since Sergeant Rullamas's conclusion was reasonable, the subsequent execution of a facially valid warrant, issued by a neutral magistrate, was done in good faith. Therefore, even if the warrant was invalid for lack of probable cause, its execution was nonetheless proper. (*Massachusetts v. Sheppard* (1984) 468 U.S. 981, 987-988.)

We conclude that the "good-faith" exception applies. Thus, even assuming defense counsel should have challenged the sufficiency of the probable cause supporting the search warrant, the searching officers acted in good faith on what appeared to be a facially valid warrant signed by a neutral magistrate. (*United States v. Leon*, *supra*, 468 U.S. at p. 923.) Accordingly, defense counsel cannot be faulted for failing to file a futile motion.

(Op. at 28-33.)

The state appellate court reasonably rejected this claim after a thorough review of

the record which showed that there was more than sufficient information to establish probable cause for the warrant: a reliable confidential informant provided a statement that Bandit was rumored to be the shooter and was feeling pressure from all sides for the unjustified shooting; Bandit was known to be a high ranking Sureño gang member; and an anonymous caller stated that Bandit was the shooter who was motivated by gang-related animus. *See supra* at 17-18. Petitioner relies on *Florida v. J.L.*, 529 U.S. 266 (2000), which involved an uncorroborated anonymous telephone that was found to be not sufficiently reliable to justify a *Terry*-stop. (Pet. Ex. A at 8-9.) But as Respondent points out, Petitioner's case is distinguishable because the warrant was based on more than just an anonymous tip: the anonymous caller here corroborated the information that came from a confidential reliable source. (Ans. at 15.) Furthermore, the state appellate court reasonably found that even if the warrant lacked probable cause, the execution was proper because the searching officers acted in good faith on what appeared to be a facially valid warrant. *See supra* at 19. Therefore, the admission of the evidence from the search was valid, and any motion to suppress that evidence would have been denied as meritless. Because Petitioner has failed to show that the overlooked motion to suppress would have been meritorious, he cannot establish ineffective assistance of counsel. *See Ortiz-Sandoval*, 323 F.3d at 1170. Accordingly, the state appellate court's rejection of this claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

### b. Failures Regarding Eyewitness Identification

Petitioner claims that counsel was ineffective with respect to how he challenged the evidence of Mendoza's eyewitness identification. Specifically, Petitioner claims that counsel failed to properly investigate whether the photographic display shown to Mendoza was unduly suggestive and move to suppress it based thereon, and to properly prepare his expert witness to attack that evidence. (Pet. Ex. A at 12-13, 15.) Petitioner also claims

counsel was ineffective for failing to seek a modification of CALCRIM No. 315 regarding the accuracy of eyewitness testimony. (*Id.* at 17-18.)

### 1. Failure to Suppress Identification

The Court of Appeal rejected the first of these claims on appeal:

> Defendant next claims ineffective assistance of counsel based upon trial counsel's failure to move to suppress the purportedly suggestive photographic array. He claims that the pretrial identification procedure was so impermissibly suggestive that it tainted the in-court identification by Mendoza.

> To support an ineffective assistance of counsel claim, the reviewing court must determine that counsel's performance "'fell below an objective standard of reasonableness… under prevailing professional norms'" and that there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 (*Ledesma*); *Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*).)

> A pretrial photographic lineup violates due process when it is so impermissibly suggestive that it creates a "very substantial likelihood of irreparable misidentification." (*People v. Contreras* (1993) 17 Cal.App.4th 813, 819.) The defendant bears the burden of proving unfairness "as a 'demonstrable reality,' not just speculation." (*Ibid.*) The threshold test is whether the pretrial "'identification procedure was unduly suggestive and unnecessary.'" (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.) If the test is met, the question becomes whether a subsequent identification at trial was nevertheless reliable under the totality of the circumstances, taking into account such factors as the witness's opportunity to view the offender at the time of the crime, the witness's attentiveness, the accuracy of the witness's prior description, the level of certainty displayed at the identification, and the time elapsed between the crime and the identification. (*People v. Ochoa* (1998) 19 Cal.4th 353, 412; *People v. Wash* (1993) 6 Cal.4th 215, 24.)

> There is no requirement that a defendant in a lineup be surrounded by others "'nearly identical'" in appearance. (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 790.) For example, distinguishing clothing does not necessarily cause a photographic lineup to cross into the realm of unconstitutional suggestiveness. (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052.) Lineups have been upheld when the defendant was the only person in jail clothing (*People v. Johnson* (1992) 3 Cal.4th

1183, 1215-1218), and when the defendant was the only person in a red shirt (*People v. DeSantis, supra*, 2 Cal.4th at p. 1222). Similarly, minor differences in facial hair also do not necessarily render a lineup unconstitutionally suggestive. (See *People v. Holt* (1972) 28 Cal.App.3d 343, 350, disapproved on other grounds in *Evans v. Superior Court* (1974) 11 Cal.3d 617, 625, fn. 6.) And differences in background color and image size among the various photographs also do not necessarily render a lineup unconstitutionally suggestive. (*People v. Holt, supra*, 28 Cal.App.3d at pp. 349-350.) The test basically comes down to this: whether the lineup as a whole would cause a witness to focus on a particular photograph, namely, the defendant's photograph. (*People v. Carpenter* (1997) 15 Cal.4th 312, 367.)

On appeal, a de novo standard applies to both prongs of the identification analysis. (*People v. Kennedy* (2005) 36 Cal.4th 595, 608-609, disapproved on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 459.) We have reviewed the photograph lineup from which Mendoza identified defendant, and are not persuaded that it is unconstitutionally suggestive. The lineup depicts six males who are sufficiently similar to support the reliability of Mendoza's identification. All six of the individuals appear to be Hispanic, all appear to be about the same age, all have short, dark hair and some form of facial hair. There are no distinctive markings in the background, or foreground or on their clothing to make one stand out in particular. Defendant's photograph – though more of a close up shot than the others – does not particularly stand out.

Moreover, even assuming the initial threshold showing of suggestiveness had been established, defendant's claim fails because the record, in our view, shows that Mendoza's in-court identification at trial was bolstered by ample indications of reliability to allow her to make the identification; it was for the jury to determine whether her in-court identification was accurate or tainted by the pretrial lineup. Mendoza provided a very detailed and accurate description fitting defendant prior to viewing the photographic lineup. She described him as a male Latino, chubby, between 5'6" and 5'8" (although she admitted she was not good at estimating heights), with a distinctive tapered hairstyle. She also described him as having very distinctive facial hair, with a single line growing from his lip to his chin. Although, while she was at the hospital, Mendoza had initially given a somewhat different description as to defendant's build, the disparities were easily explained by her pain and pain medication. Moreover, Mendoza had plenty of undistracted opportunity to observe defendant during the shooting, as she was only 16 feet away from him, there was sufficient lighting from the houses and streetlights, defendant was moving towards her rather than away from her, her opportunity to observe

him lasted between 20 and 30 seconds, and there was nothing obstructing her view.

Mendoza also told Sergeant Rullamas that she thought she recognized defendant from somewhere, and prior to any further exposure, made the connection of having gone to grade school with him. Additionally, she made the connection of having seen defendant twice in 2005 when he visited her downstairs neighbors. Then, after having identified his picture in the photographic lineup, she was also able to identify him when, by chance, she happened to see his arrest while watching a television show on the Discovery Channel called "Gang Wars." Also at the preliminary hearing, in the face of defendant's smirks and smiles, and threats and vulgarities, leveled by those in the audience, Mendoza positively identified defendant.

Mendoza's level of certainty in her identification at trial was absolute. She identified defendant as the shooter within a second and repeatedly stated she was 100 percent sure he was the shooter. She confidently and positively identified him at trial, even when defendant was shaking his head at her.

The totality of the circumstances demonstrates that Mendoza's pretrial identification was not made under impermissibly suggestive conditions and was reliable. (*People v. Cook* (2007) 40 Cal.4th 1334, 1354.) Thus, a motion to suppress the identification would properly have been denied. Counsel's failure to challenge the evidence did not amount to ineffective assistance. As we conclude a challenge to the photo lineup procedure would have failed, we also reject defendant's challenge to the in-court identification, which was premised on his contention that the pretrial identification was improperly conducted. (See *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1082, disapproved on other grounds in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1370-1371.)

(Op. at 14-17.)

Due process requires suppression of eyewitness identification evidence "when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012); *see Manson v. Brathwaite*, 432 U.S. 98, 107-09 (1977); *Neil v. Biggers*, 409 U.S. 188, 196-98 (1972). The purpose of this rule is "to deter police from rigging identification procedures." *Perry*, 565 U.S. at 258. An identification procedure is impermissibly suggestive when it emphasizes the focus upon a single individual, thereby increasing the likelihood of

misidentification. *See United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985), *cert. denied*, 475 U.S. 1023 (1986); *see, e.g.*, *United States v. Burdeau*, 168 F.3d 352, 357-58 (9th Cir. 1999) (finding that photo placement, hue and facial expression were insubstantial differences between defendant's photograph and the others in a photographic array and did not create an impermissible suggestion that defendant was the offender).

The state appellate court's rejection of this claim was not unreasonable. The state appellate court reviewed the photograph lineup from which Mendoza identified Petitioner and described the lineup as depicting "six males who are sufficiently similar to support the reliability of Mendoza's identification," i.e., Hispanic, about the same age, with short, dark hair and some form of facial hair. *See supra* at 22. Furthermore, the state appellate court found that there were no distinctive markings in the background, the foreground, or on the men's clothing to make any particular one stand out. *Id.* The only difference with Petitioner's photograph was that it was more of a closeup shot than the others, but the state appellate court found that it still did not make it particularly stand out. *Id.* Having reviewed the photo lineup that was before the state appellate court, (CT 490), the Court finds this determination is supported by the record. 28 U.S.C. § 2254(d)(2).

Furthermore, even if the pretrial identification procedure was unnecessarily suggestive, the in-court identification testimony was sufficiently reliable to be admissible. Standing alone, the fact that there has been improper state conduct in arranging unnecessarily suggestive pretrial identification procedures does not require exclusion of in-court identification testimony; the reliability of the eyewitness testimony is the "linchpin" in determining its admissibility. *Manson*, 432 U.S. at 100-14. Identification testimony is inadmissible as a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure. *See Van Pilon v. Reed*, 799 F.2d 1332, 1338 (9th Cir. 1986). A reviewing court may assume suggestiveness and review reliability first. *See id.* at 1339. In determining whether in-court identification testimony is

sufficiently reliable, courts consider five factors: (1) the witness' opportunity to view the defendant at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification. *See Manson*, 432 U.S. at 114; *Neil*, 409 U.S. at 199-200.

The state appellate court was not unreasonable in determining that Mendoza's in-court identification at trial was reliable based on factors similar to those described in *Manson* and *Neil*. With respect to the first factor, the state appellate court found that Mendoza had ample opportunity to observe Petitioner during the shooting because: (1) Petitioner was only 16 feet away from her, (2) there was sufficient lighting from the houses and streetlights, (3) Petitioner was moving towards her rather than away from her, (4) she had between 20-30 seconds to observe him, and (5) there was nothing obstructing her view. *See supra* at 22-23. With respect to the second factor of degree of attention, the state appellate court described Mendoza's opportunity to see Petitioner as "undistracted," *id.* at 23, and the trial record shows Mendoza testified at trial that when she turned around after hearing gun shots, her focus was immediately on Petitioner's face which she could see clearly, and that she kept her eyes on him as he continued to shoot Casillas and then her. (RT 423-24, 429-430.) The third factor regarding accuracy of the prior description – before she was shown the photo lineup – was also high as Mendoza described the shooter as a young male Latino, chubby to very heavyset, between 5'6" and 5'8", and having distinctive facial hair consisting of a single line growing from his lip to his chin; after giving this description, Mendoza was absolutely certain she could identify the shooter. *See supra* at 5. Her certainty was confirmed as she identified Petitioner within seconds of being shown the photographic lineup and then again at trial where she immediately identified him as the shooter and stated she was "100 percent sure" he was the shooter, (RT 435), which makes the fourth factor, regarding Mendoza's level of certainty in the identification, high. *Id.* Lastly, the length of time that passed between the incident (September 19) and the identification (December 1) was lengthy, i.e., approximately two

and a half months. Notwithstanding this lengthy delay, the first four factors weigh heavily in favor of reliability. *See, e.g.*, *United States v. Drake*, 543 F.3d 1080, 1089 (9th Cir. 2008) (finding that where first four factors weighed in favor of reliability, four-day delay between robbery and photo spread identification did not call identification's accuracy into question); *United States v. Wang*, 49 F.3d 502, 505 (9th Cir. 1995) (identification of defendant in photographs reliable where witness had ample opportunity to view defendant and actually spoke with him). Based on this "totality of the circumstances," the state appellate court reasonably found that Mendoza's identification was reliable. *See supra* at 23. Because Mendoza's identification was sufficiently reliable to outweigh any corrupting effects of a presumably suggestive photographic lineup (which neither the Court of Appeal nor this Court finds), her identification testimony was not inadmissible. *See Van Pilon*, 799 F.2d at 1338. Therefore, it follows that a motion to suppress the identification would have been denied and counsel was not ineffective for failing to make a meritless motion. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005). Accordingly, the state appellate court's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

### 2. Failure to Prepare Expert Witness

The Court of Appeal also rejected the claim that counsel was ineffective for failing properly to prepare his expert witness to give testimony on the photo lineup.

> Defendant also contends his trial counsel rendered ineffective assistance as a result of his failure to adequately prepare defense expert Dr. Shomer for trial. In particular, defendant claims that trial counsel failed to show Dr. Shomer the photo lineup, which prevented Dr. Shomer from telling the jury that the lineup was unfair and precluded him from explaining that defendant's picture stuck out like a "'sore thumb.'"

> As previously explained, defendant has the burden to show his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable

26

probability that, but for counsel's error, the result would have been different. (*Strickland*, *supra*, 466 U.S. at pp. 687-688; *People v. Kelly* (1992) 1 Cal.4th 495, 519-520; *Ledesma*, *supra*, 43 Cal.3d at pp. 216, 218.) Defendant has not met his burden.

Contrary to defendant's contention, it was not for Dr. Shomer to tell the jury that the lineup used in this particular case was unfair or that defendant's picture stuck out like a "'sore thumb.'" Rather, it was within the exclusive province of the jury to decide, based on the factors described by Dr. Shomer, whether the photo lineup was problematic. Even if Dr. Shomer had viewed the photo lineup, it was beyond the scope of his testimony to comment on it or advise the jury about how it should view it. Specifically, Dr. Shomer testified: "I am not here to give any conclusion about who is right or wrong or the effects of how any one in particular reacts to a situation. I… simply… provide information that may or may not be used in terms of evaluating the other evidence in this case. *I am not evaluating it*; I am simply here to give information about an aspect of it rather than to come to some conclusion based on some tests of a witness,… I am here simply to provide information about how these processes have been found to work,… if anyone desires to use them in evaluating accuracy of the identification in this case." (Italics added.)

On this record, even if trial counsel erred in not providing Dr. Shomer with a copy of the photo lineup (a position we do not take), there is no reasonable probability that, but for counsel's error, the result of the proceedings would have been different. (*Strickland*, *supra*, 466 U.S. at pp. 687-688; *Kelly*, *supra*, 1 Cal.4th at pp. 519-520; *Ledesma*, *supra*, 43 Cal.3d at pp. 216, 218.)

(Op. at 17-18.)

The state appellate court's rejection of this claim was not unreasonable. Expert testimony is necessary when lay persons are unable to make an informed judgment without the benefit of such testimony. *See Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) (jury informed that plaintiff exposed to neurotoxic chemicals but not informed of the ramifications of such exposure). Where the evidence does not warrant it, the failure to call an expert does not amount to ineffective assistance of counsel. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (a decision not to pursue testimony by a psychiatric expert is not unreasonable when the evidence does not raise the possibility of a strong mental state defense). Here, the particular aspect of the expert opinion of Dr. Shomer that Petitioner

claims was missing from his testimony was not necessary for the jury to make an informed judgment with respect to the reliability of the victim's identification of Petitioner.

The Ninth Circuit has determined that failure to call an expert witness on the unreliability of eyewitness identification does not constitute ineffective assistance because "skillful cross examination of eyewitnesses, coupled with appeals to the experience and common sense of jurors, will sufficiently alert jurors to specific conditions that render a particular eyewitness identification unreliable," which precludes a finding of prejudice under *Strickland*. *Howard v. Clark*, 608 F.3d 563, 574 (9th Cir. 2010). In Petitioner's case, unlike in *Howard*, counsel did in fact call Dr. Shomer as an expert in the field of eyewitness identification, and he testified regarding various problems related to the accuracy of such identifications to aid the jurors in deciding for themselves whether Mendoza's identification was accurate. As Dr. Shomer testified, his purpose was not to evaluate the identification but only "to give information about an aspect of it rather than to come to some conclusion…." *See supra* at 27. Dr. Shomer's testimony was limited such that he would not have been permitted to give an opinion with respect to the fairness of the lineup. Accordingly, it cannot be said that counsel was ineffective for failing to present evidence that would not have been allowed, or in other words, that his conduct was prejudicial. *See Howard*, 608 F.3d at 574. The state appellate court's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d).

### 3. Failure to Request Modification of CALCRIM No. 315

In response to Petitioner's two claims regarding CALCRIM No. 315, the Court of Appeal first rejected the underlying claim that the trial court erred in giving an unmodified version of CALCRIM No. 315.

> Defendant contends that the court erred in utilizing an "unadorned" version of CALCRIM No. 315, which instructs the jury to consider, as one of many factors in deciding whether an eyewitness gave truthful and accurate testimony, "how certain" the witness was when he or she made the identification. [FN8] Defendant argues that this part of the instruction

28

deprived him of a fair trial by allowing the prosecution to "diminish the reasonable doubt standard."

FN8. CALCRIM No. 315 instructed the jury in this case as follows: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] · Did the witness know or have contact with the defendant before the event? · How well could the witness see the perpetrator? · What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? · How closely was the witness paying attention? · Was the witness under stress when she made the observation? · Did the witness give a description and how does that description compare to the defendant? · How much time passed between the event and the time when the witness identified the defendant? · Was the witness asked to pick the perpetrator out of a group? · Did the witness ever fail to identify the defendant? · Did the witness ever change her mind about the identification? · How certain was the witness when she made an identification? · Are the witness and the defendant of different races? · Was the witness able to identify the defendant in a photographic or physical lineup? · Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find [] the defendant not guilty."

The California Supreme Court has held that the relevant factors to be considered in determining whether identification evidence is reliable are those identified by the United States Supreme Court in *Neil v. Biggers* (1972) 409 U.S. 188. (*People v. Kennedy* (2005) 36 Cal.4th 595, 610; *People v. Arias* (1996) 13 Cal.4th 92, 168.) In *Neil v. Biggers*, the high court noted: "As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, *the level of certainty demonstrated by the witness at the confrontation*, and the length of time between the crime and the confrontation." (*Neil v. Biggers*, *supra*, 409 U.S. at pp. 199-200, italics added.)

The certainty factor also appeared in CALCRIM No. 315's predecessor, CALJIC No. 2.92. The California Supreme Court has consistently rejected challenges to CALJIC No. 2.92. (See *People v. Ward*

(2005) 36 Cal.4th 186, 213; *People v. Johnson* (1992) 3 Cal.4th 1183, 1230-1231; *People v. Wright* (1988) 45 Cal.3d 1126, 1143-1144.)

Acknowledging the factors enumerated in *Neil v. Biggers*, but disregarding the California decisions, defendant quotes extensively from an out of state opinion citing scientific studies questioning the accuracy of eyewitness identification evidence. (See, e.g., *State v. Lawson* (Ore. 2012) 291 P.3d 673, 688 "[w]itness certainty, although a poor indicator of identification accuracy in most cases, nevertheless has substantial potential to influence jurors.") Sister-state decisions may be persuasive, but they are not binding. (*Gutierrez v. Superior Court* (1994) 24 Cal.App.4th 153, 170.)

There is, however, no shortage of California authority on this topic. The California Supreme Court rejected an argument similar to defendant's in *People v. Johnson*, *supra*, 3 Cal.4th at pages 1231-1232. There, the defendant challenged the certainty factor, because his eyewitness identification expert "testified without contradiction that a witness's confidence in an identification does not positively correlate with its accuracy." (*Id.* at p. 1231.) The court held that the certainty factor of CALJIC No. 2.92 was neutral and did not instruct the jury to accept or reject the expert's testimony; the jury was free to reject it, even if uncontradicted. (*Id.* at pp. 1230, 1231-1232; see also *People v. Sullivan* (2007) 151 Cal.App.4th 524, 562; *People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1302-1303, disapproved on another point in *People v. Martinez* (1995) 11 Cal.4th 434, 452.)

In evaluating a claim of instructional error, the reviewing court must consider whether there is a reasonable likelihood of misapplication by evaluating the whole record, including the instructions in their entirety and the arguments that counsel presented to the jury. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4; *Kelly*, *supra*, 1 Cal.4th at pp. 526-527.) "The only question for us is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" (*Estelle*, *supra*, at p. 72.) "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (*Ibid*.)

The jury instruction here set forth a multitude of factors that the jury might consider in evaluating the accuracy of the eyewitness testimony. Dr. Shomer's testimony emphasized the need to consider factors other than the witness's certainty, most of which were included in the non-exclusive list of factors (i.e., stress, unexpectedness, distance, duration, and lighting) included in the jury instruction. The instruction did not require the jury to find that an eyewitness who is certain is necessarily correct. Rather, the jury was instructed to weigh the different factors as it deemed appropriate.

Defendant contends the instruction fundamentally discredited his case, by conflicting with scientific research regarding reliability of eyewitness identification and Dr. Shomer's testimony on this subject. Defendant complains that the prosecutor "emotionally repeated" Mendoza's testimony that she was 100 percent positive in her identification of defendant as a shooter. According to defendant, this argument was bolstered by CALCRIM No. 315, and the combined effect "caused the jury to trust [the] prosecutor's judgment rather than that of its own and that of science.'" The prosecutor, however, did not argue that the jury should completely disregard Dr. Shomer's testimony given Mendoza's testimony. Rather, the prosecutor sought to discredit Dr. Shomer as being nothing more than a "professional [d]efense witness." Moreover, the jury was not bound by the instruction to either accept or reject the testimony of Dr. Shomer or Mendoza. The jury was free to give the certainty factor little or no weight. The court instructed the jury that it must consider an expert's opinions, but it was "not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide." The inclusion of certainty as one factor to consider did not instruct the jury to disregard or to minimize the significance of Dr. Shomer's testimony. There was no error in giving the instruction.

(Op. at 18-21.)

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314, 317 (9th Cir.1988).

The state appellate court rejected the underlying claim challenging the unconstitutionality of CALCRIM No. 315 by applying Supreme Court precedent in

*Estelle*, and did not judge the instruction in artificial isolation but considered it "in the context of the instructions as a whole and the trial record." *See supra* at 30, citing *Estelle*, 502 U.S. at 72. The state appellate court discussed other instructions that were considered, including the multitude of factors that the jury might consider in evaluating the accuracy of the eyewitness testimony, and that it was to weigh the different factors as it deemed appropriate; the jury was not required to find that an eyewitness who is certain is necessarily correct. *See supra* at 30-31. Furthermore, the trial record also showed that Dr. Shomer's testimony emphasized the need to consider factors other than certainty, most of which were included in the non-inclusive list. *Id.* at 31. Lastly, the court instructed the jury that it "must consider an expert's opinions, but it was 'not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide.'" *Id.* Accordingly, in the context of the instructions as a whole and the trial record, it cannot be said that CALCRIM No. 315, as given, so infected the entire trial such that the resulting conviction violated due process. *See Estelle*, 502 U.S. at 72. Therefore, the state appellate court's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d).

The Court of Appeal then rejected Petitioner's claim that counsel was ineffective for failing to seek a modification of CALCRIM No. 315.

> In his habeas petition, defendant alternatively claims that trial counsel was ineffective for failing to seek a modification of CALCRIM No. 315 to remove certainty as a factor to be considered by the jury. In support of this contention, defendant relies on several scientific studies to support his position that the prevailing view is that – under most circumstances – eyewitness certainty is not a predictive indicator of accuracy.

> Below, rather than objecting to the instruction, defendant's counsel attacked Mendoza's certainty by presenting expert testimony that eyewitness certainty is not indicative of accurate identification and by emphasizing other factors that tended to cast doubt on her ability to make an accurate identification – such as her distance from the suspect, the darkness of the evening, and her initial discrepancies regarding defendant's weight. Under the circumstances we cannot conclude that counsel's performance fell below the standard to be expected of trial counsel.

Moreover, even if the attorney's failure to request a modification was deficient, a defendant fails to show prejudice. Under the current state of the law, it is unlikely that a modified instruction would or should have been given even if requested. And if it had, it is not likely to have produced a different outcome. Defense counsel pointed out to the jury all of the reasons to reject Mendoza's identification. The jury instructions directed jurors to consider numerous factors other than the witness's certainty which bore upon the reliability of the identification. Thus, defendant has failed to demonstrate either element necessary to establish ineffective assistance of counsel.

(Op. at 22-23.)

The state appellate court's rejection of this claim was not unreasonable. First of all, in rejecting the underlying claim, the state court discussed how certainty was a factor that was a relevant under Supreme Court precedent in *Neil v. Biggers*, 409 U.S. 188. *See supra* at 29-30. It also discussed that certainty was a factor in CALCRIM No. 315's predecessor, CALJIC No. 2.92, which had withstood repeated challenges in the state high court. *Id.* Therefore, the state court reasonably found that "[u]nder the current state of the law, it is unlikely that a modified instruction would or should have been given even if requested." (Op. at 22.) As such, it cannot be said that counsel was ineffective for failing to make a meritless motion. *See Juan H.*, 408 F.3d at 1273. Furthermore, counsel attacked the victim's certainty with expert testimony regarding factors that can undermine a witness's ability to make an accurate identification, and the jury instructions also included numerous factors to consider other than a witness's certainty. *Id.* Accordingly, the state appellate court reasonably determined that Petitioner failed to establish either prong under *Strickland*: that counsel's performance fell below the professional standard, and that but for counsel's failure to request a modified version of CALCRIM No. 315, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. The state appellate court's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d).

///

### c. Failure to Move to Excuse Juror 30

Petitioner claims that counsel was ineffective for failing to move to excuse Juror 30 for losing the ability to be fair and impartial. (Pet. Ex. A at 21-22.)

The Court of Appeal rejected this claim on appeal:

> … [D]efendant asserts that trial counsel was ineffective for failing to seek removal of Juror Number 30. This contention is without merit. As noted above, after conducting a thorough voir dire, the court did not excuse the juror and the juror repeatedly assured the court that she could remain fair and impartial, and would not let her weekend experience influence her service on the jury. A motion to excuse the juror would have failed. Thus, defendant fails to show a prima facie case for relief based on counsel's inaction.

(Op. at 36.)

The Court discusses the merits of the underlying claim in Section 3 below, and finds the state appellate court's rejection of the claim was not unreasonable. *See infra* at 44-49. Accordingly, the state appellate court reasonably determined here that Petitioner failed to establish prejudice, *i.e.*, that but for counsel's failure to move to excuse Juror 30, the result of the proceeding would have been different because there was no basis to grant such a motion. *Strickland*, 466 U.S. at 694. The state appellate court's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d).

### d. Failure to Object to Prosecutorial Misconduct

Petitioner claims that counsel was ineffective for failing to object to the following alleged prosecutorial misconduct: (1) making improper statements during closing argument, alluding to facts outside the record, i.e., Mendoza's medical records that were disclosed during discovery, (Pet. Ex. A at 27-28); (2) pointing out the absence of defense evidence where such absence was due to the trial court sustaining the prosecution's objection to that evidence, i.e., the fact that Dr. Shomer did not look at the photo lineup given to Mendoza in which she identified Petitioner, (*id*. at 29-32); and (3) making improper statements during closing argument that Dr. Shomer's testimony regarding stress

was completely wrong, (*id*. at 32-36). The state appellate court's opinion is silent with respect to the first two of these claims, and it is unclear whether the two claims were exhausted. In any case, the Court can deny a claim on the merits even if it is unexhausted. *See* 28 U.S.C. § 2254(b)(2).

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005); *see also Deck v. Jenkins*, 814 F.3d 954, 978 (9th Cir. 2016) (recognizing that *Darden* is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes). A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995); *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

With respect to the first claim, Petitioner asserts that the prosecution made improper statements during closing argument by alluding to facts outside the record, i.e., Mendoza's medical records that were disclosed during discovery that would show what medication she was taking when she made the identification of Petitioner on December 1, 2008. (Pet. Ex. A at 27.) Petitioner asserts that "no medical records were produced during the trial" and that there was "no evidence before the jury as to what in fact had been turned over to the defense by the prosecution in discovery." (*Id*.) Petitioner asserts that counsel's failure to object to these statements prejudiced him because "1) it buttressed and increased [Mendoza's] credibility with the jury, and 2) it underscored trial counsel's failure to

produce promised testimony, thus leading the jury to believe that the defense was flawed." (*Id.* at 28.) However, even if the Court assumes that these statements were improper and counsel should have objected, Petitioner fails to establish prejudice, *i.e.*, the proceeding would have been different but for counsel's failure to object. *Strickland*, 466 U.S. at 694. As discussed by the state appellate court, there was "ample evidence" to establish Petitioner's culpability for the offenses, even without this improper "buttress[ing] and increas[ing]" of Mendoza's credibility by the prosecution's statements. *See supra* at 35. As discussed above in the "failure to suppress identification" claim, Mendoza's level of certainty in her identification of Petitioner at trial was "absolute," as she immediately identified him as the shooter even as he was shaking his head at her. *See supra* at 25-26. As such, it cannot be said that in the absence of additional bolstering of Mendoza's credibility, the jury would have reached a different verdict. Accordingly, Petitioner is not entitled to habeas relief on this claim as it is without merit.

For the same reason, Petitioner fails to establish prejudice with respect to counsel's failure to object to the prosecution's reference to the fact that Dr. Shomer did not look at the photo lineup in the case in his closing argument. (Pet. Ex. A at 31.) Even had counsel objected to this statement, it cannot be said that the outcome of the trial would have been different in light of the absolute certainty of Mendoza's in-court identification and the abundance of gang-related evidence establishing Petitioner's culpability. Accordingly, Petitioner is not entitled to habeas relief on this claim as it is without merit.

Lastly, Petitioner claims that the prosecution made improper statements in closing argument that Dr. Shomer's testimony regarding stress was "completely wrong." (Pet. Ex. A at 32.) The state appellate court rejected this claim on direct appeal:

> We skip the analysis of whether trial counsel's performance fell below prevailing professional norms and proceed directly to the question of prejudice. (*People v. Holt* (1997) 15 Cal.4th 619, 703; *In re Fields* (1990) 51 Cal.3d 1063, 1079). We find there is no basis for defendant's argument that counsel's alleged failings prejudiced him. Ample evidence at trial established his culpability for the offenses; credible eyewitness testimony by one of the victims, who repeatedly and confidently identified defendant

as the shooter; defendant's self-admission of being a gang member; as well as various gang-related evidence. Thus, it is not reasonably probable that the outcome of the trial could have been more favorable had trial counsel called the witnesses he mentioned during opening statement, objected to the gun evidence, moved for disclosure of the confidential informant, and objected to the prosecutor's comments during closing argument about Dr. Shomer's testimony. We consequently reject these arguments.

(Op. at 39-40.)

Respondent asserts that the prosecution's challenged statement was merely an argument, "urging the jury to use its common sense rather than blindly accept the testimony of the defendant's eyewitness identification expert," and that there was nothing objectionable in asking the jury "to use its common sense and find that stress could potentially heighten the accuracy of an identification" to counter Dr. Shomer's testimony that in simulated studies, stress usually reduced the reliability of an eyewitness identification. (Ans. at 25.) The Court agrees that there was nothing improper in these statements. In section b.3 above, the Court discussed the ineffective assistance of counsel claim regarding a jury instructional error on eyewitness testimony. *See supra* at 28-33. In rejecting that claim, the state appellate court stated that the jury instructions set forth a multitude of factors that the jury might consider in evaluating the accuracy of eyewitness testimony, including stress, and that the jury was "to weigh the different factors as it deemed appropriate." *Id.* at 31. Towards that end, the prosecution here was merely making an argument in how the jury should consider stress as one of those factors, but it was still up to the jury to decide which argument was supported by the evidence. There was no misconduct. Where there was no prosecutorial misconduct to object to, it cannot be said that counsel was deficient for failing to make what would have been a meritless motion. *See Juan H.*, 408 F.3d at 1273. Accordingly, the state appellate court's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d).

### e. Failure to Object to Admission of Gun Evidence

Petitioner claims that counsel was ineffective for failing to object to the evidence of

additional guns that were admitted or referenced at trial. (Pet. Ex. A at 36.) The state appellate court rejected this claim, along with the preceding claim involving prosecutorial misconduct, finding no prejudice: "We find there is no basis for defendant's argument that counsel's alleged failings prejudiced him. Ample evidence at trial established his culpability for the offenses:…. Thus, it is not reasonably probable that the outcome of the trial would have been more favorable had trial counsel… objected to the gun evidence…." *See supra* at 37. Respondent asserts although the state court focused only on prejudice, trial counsel's decision to forego an objection was likely a tactical one. (Ans. at 27.) The defense strategy at trial was mistaken identity. Therefore, the admission of these other guns would have helped to spread potential blame and suggest that a gang member other than Petitioner was responsible for the shooting. (Ans. at 27.)

The state appellate court's rejection of this claim was not unreasonable because there were valid reasons for the admission of the weapons in this case. The guns at issue are the ones found in residences and vehicles of various SSL gang members directly associated with Petitioner. *See supra* at 6-7. These additional guns were admitted to prove predicate gang charges and to corroborate the prosecution's expert witness testimony that most SSL firearms were "gang guns," which were not individually owned but instead shared among gang members. *Id.* at 6. Furthermore, the murder weapon itself was found in the residence of a different gang member, such that Petitioner's only direct association with any weapons was from social networking sites where he readily admitted possessing and shooting firearms, and was even seen holding an AK-47, the same type of weapon used in the shooting. *Id.* Therefore, the evidence showing Petitioner's association with firearms was directly tied to his gang membership, which in turn was tied to the motive for the murder. Because there were numerous reasons to support the admission of these other weapons, it cannot be said that any objection by counsel to this evidence would have been sustained; counsel was not ineffective for failing to make a meritless motion. *See Juan H.*, 408 F.3d at 1273. Accordingly, the state appellate court's rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly

established Supreme Court precedent. 28 U.S.C. § 2254(d).

### f.    Conclusion

Petitioner asserts in his traverse that the state appellate court's decision rejecting his ineffective assistance of counsel claims was unreasonable and requests an evidentiary hearing. (Trav. at 10-16.) However, based on a "doubly" deferential judicial review, the Court has found that there are reasonable arguments under each ineffective assistance of counsel claim discussed above such that the state appellate court's application of *Strickland* was not objectively unreasonable. *See Pinholster*, 563 U.S. at 200-202; *Harrington*, 562 U.S. at 105. Accordingly, the Court denies the request for an evidentiary hearing as unnecessary.

### 2.    Admission of Gang Evidence

Petitioner claims that the admission of "over the top gang" evidence deprived him of due process and a fair trial. (Pet. Ex. A at 39.)

The Court of Appeal rejected this claim on appeal:

> Defendant contends the admission of photographs showing him flashing gang signs and wearing blue, gang-related writings, and weapons/ammunition other than the murder weapon, together with the testimony of a gang expert, was highly prejudicial, cumulative, and its probative value was minimal. He claims that the admission of such evidence constitutes a violation of his federal constitutional due process rights. The Attorney General contends defendant forfeited his arguments by failing to object on the asserted ground at trial. Based on our review of the record, defendant forfeited his evidentiary claims. (Evid. Code, § 353, subd. (a) [a judgment shall not be reversed based on erroneous admission of evidence unless the record shows the party seeking reversal objected to the evidence on the specific ground raised].)

> Although it appears that defense counsel raised a "blanket objection" to the gang evidence and improper expert testimony (see Evid. Code, §§ 801, 802) there is nothing showing an objection to the gang expert's testimony, and nothing on the grounds now raised on appeal. In any event, we reject defendant's arguments on the merits.

> It is generally recognized that evidence of a defendant's gang membership, when introduced in a prosecution unrelated to the gang's

activities, tends to be prejudicial because it suggests a criminal disposition. (*People v. Pinholster* (1992) 1 Cal.4th 865, 945, overruled on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.) When such evidence is relevant to prove an element of the crime, however, it may be admitted if, after careful scrutiny, it is found more probative than prejudicial. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.)

Where, as here, a section 186.22 gang enhancement allegation is pleaded, the defendant's gang membership becomes an element of the prosecution's case. Section 186.22 imposes a sentence enhancement for a felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Id.*, subd. (b)(1); *People v. Loeun* (1997) 17 Cal.4th 1, 4.) "To establish a gang enhancement, a prosecutor must prove facts beyond the elements of the underlying offense. [Citation.] 'Accordingly, when the prosecution charges the criminal street gang enhancement, it will often present evidence that would be inadmissible in a trial limited to the charged offense.'" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 820.)

To prove a section 186.22 gang enhancement, the prosecution must demonstrate that the defendant was a member of a "criminal street gang," as defined by the statute. "The act defines 'criminal street gang' as any ongoing association that consists of three or more persons, that has a common name or common identifying sign or symbol, that has as one of its 'primitive activities' the commission of certain specified criminal offenses, and that engages through its members in a '*pattern of criminal gang activity*.' ([§ 186.22], subd. (f), italics added.) A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' specified criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.'" (*People v. Loeun, supra*, 17 Cal.4th at p. 4.) The prosecution may prove a "pattern of criminal gang activity" through evidence pertaining to the charged offense and at least one other offense committed on a prior occasion by a fellow gang member. (*Id.* at pp. 4-5.) Similarly, the requirement that one of the gang's "primary activities" is the commission of the statutory crimes is generally proven through evidence of past crimes committed "consistently and repeatedly" by the defendant and other gang members. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323-324, italics omitted; see also *People v. Tran* (2011) 51 Cal.4th 1040, 1049-1051.)

The allegation of a section 186.22 enhancement, however, does not give the prosecution an unlimited ability to introduce gang evidence. As defendant correctly argues, the admission of gang evidence is always

subject to Evidence Code section 352, which requires the exclusion of evidence that is more prejudicial than probative.  While some evidence of a gang's criminal and other activities is necessary to prove a gang enhancement, the prosecution has no right to "'over-prove'" the case or put on "'all the evidence that they have.'"  (*People v. Williams* (2009) 170 Cal.App.4th 587, 610.)  "[N]either the prosecution nor the defendant has a right to present cumulative evidence that creates a substantial danger of undue prejudice [citation] or that unduly consumes the court's time…. [¶]…[¶]  Although no bright-line rules exist for determining when evidence is cumulative, we emphasize that the term 'cumulative' indeed has a substantive meaning, and the application of the term must be reasonable and practical."  (*Id.* at 611.)  This is particularly true when the defendant's gang membership and the status of the gang are "not reasonably subject to dispute."  (*Ibid.*; *People v. Leon* (2008) 161 Cal.App.4th 149, 169.)  We review the trial court's admission of gang evidence under these circumstances for abuse of discretion.  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 225.)

The overarching theme of defendant's claim of error is that the highly prejudicial nature of the gang evidence far outweighed any probative value, particularly since his gang affiliation was not in dispute.  Defendant's self-admission to being a gang member does not entitle him to a blanket exclusion of evidence regarding his gang-related activities.  (See, e.g., *People v. Vines* (2011) 51 Cal.4th 830, 865-866; *People v. Tran*, *supra*, 51 Cal.4th at pp. 1048-1049; *People v. Leon*, *supra*, 161 Cal.App.4th at p. 62.)  Rather, the prosecution has a right to prove its case, including evidence that is unfavorable to the defendant.  (*People v. Vines*, *supra*, 51 Cal.4th at pp. 865-866 ["Even if defendant focused his efforts at trial on disputing his identity as the perpetrator, the prosecution was required to prove its case, including the intent elements of the charged crimes"].)

Here, the challenged evidence went beyond simply authenticating defendant's admissions that he was in a gang.  The expert opined that defendant was a loyal, high-ranking "shot caller" in the gang, that he was responsible for "putting in work" in order to motivate younger, less-experienced gang members, that this particular murder was likely committed as an example of "putting in work," that the "work" involved going out in a group (in order to validate the killing), and hunting for rival gang members to shoot, that the motive for the shooting was gang-related, and that killing provides respect.  It was largely irrelevant that the victims were not rival gang members; only that they may have appeared that way to defendant.  As the expert opined, a person wearing a red hat in a Norteño neighborhood was likely to be perceived as a Norteño, regardless of whether he or she was a gang member.  Furthermore, the expert discussed the fierce rivalries between the various gangs, and he opined that SSL was

particularly violent out of necessity (because they were significantly outnumbered by other gangs and therefore had to use more violence to earn an equivalent amount of street credibility), that the members routinely had access to weapons, that weapons were readily passed around among the members rather than owned by a particular individual, and that a gang member was much more likely to take a weapon into enemy territory. Evidence of guns, photographs of defendant with guns, and writings containing multiple references to committing violent acts, was admissible to support the expert's opinion and to establish the gang enhancement.

Defendant has failed to show that the probative value of the evidence was "substantially outweighed" by the probability its admission would cause "undue prejudice." (Evid. Code, § 352.) The type of prejudice with which Evidence Code section 352 is concerned with is that which tends to evoke an emotional bias against a party or to cause a jury to prejudge a party based on factors other than the evidence presented at trial. (*People v. Scott* (2011) 52 Cal.4th 452, 490-491; *People v. Tran*, *supra*, 51 Cal.4th at p. 1048.) In this case, the gang expert's testimony was no more prejudicial than other evidence introduced at trial. Additionally, the challenged evidence was much less inflammatory than the eyewitness testimony concerning the facts surrounding the charged offenses and did not rise to a level of evoking an emotional bias against defendant. [FN7]

> FN7. For the first time in his reply brief, defendant argues that the prejudicial effect of the gang evidence was demonstrated by the jurors' concern for their own personal safety. It is well-established that issues raised for the first time on appeal in a reply brief, denying respondent an opportunity to respond to the issue, will not be addressed on appeal. (*People v. Zamudio* (2008) 43 Cal.4th 327, 353-354.)

In sum, the trial court did not abuse its discretion in admitting the gang expert's testimony and related evidence because the gang evidence was relevant to material issues in the case and its probative value was not outweighed by the probability of undue prejudice. Further, having found that the evidence was properly admitted, we conclude the admission of the evidence did not violate defendant's rights to due process and a fair trial.

(Op. at 8-13.)

Respondent first argues that this claim is procedurally barred. (Ans. at 29-30.) However, if the state court does not rely on a potential procedural bar but instead considers the federal claim on the merits, there is no procedural default, and the federal court may consider the claim. *See Ylst*, 501 U.S. at 801. Accordingly, this Court shall review the

claim on the merits as the state appellate court went ahead and did so here. *See supra* at 39.

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), cert. *denied*, 479 U.S. 839 (1986). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court precedent under § 2254(d)); *see, e.g.*, *Zapien v. Martel*, 849 F.3d 787, 794 (9th Cir. 2016) (because there is no Supreme Court case establishing the fundamental unfairness of admitting multiple hearsay testimony, *Holley* bars any such claim on federal habeas review).

The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990. But note that only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). Even if an evidentiary error is of constitutional dimension, the court must consider whether the error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

The state appellate court's rejection of this claim was not unreasonable. First of all, it cannot be said that the admission of the challenged gang evidence was arbitrary when it was admitted to prove an element of the prosecution's case, i.e., that Petitioner was subject to a gang enhancement under section 186.22. *See supra* at 40. Secondly, the state appellate court reasonably determined that although Petitioner's gang membership was not

in dispute, the challenged evidence was admitted for more than just to prove gang membership. *Id.* at 41-42. The testimony of the gang expert showed that: Petitioner had a motive for the killing as a high-ranking shot-caller for the SSL; Petitioner went into the rival territory on the evening of the crime to commit a murder in order to motivate younger, less experienced gang members and to gain respect; the victim wearing a red hat was enough to make him a target as a likely Norteño member; the SSL was particularly violent out of necessity, being significantly outnumbered by other gangs; and the members shared weapons which they passed amongst each other *Id.* The other gang evidence – photographs, gang-related writings, and weapons – was admitted to support the expert's opinion and to prove the gang enhancement. *Id.* Because the jury could infer from this gang evidence that Petitioner had motive and the means to kill the victim, it cannot be said that there were *no* permissible inferences that the jury could draw from this evidence to violate due process. *See Jammal*, 926 F.2d at 920. The state appellate court also reasonably determined that the gang expert's testimony "was no more prejudicial than other evidence introduced at trial," and was "less inflammatory than the eyewitness testimony concerning the facts surrounding the charged offenses." *See supra* at 42. Because the probative value was not outweighed by the probability of undue prejudice, the Court is not persuaded that any error in the admission of this gang evidence was of such magnitude that it rendered the trial fundamentally unfair. *See Henry*, 197 F.3d at 1031.

Based on the foregoing, the state court's rejection of this claim was not contrary to or an unreasonable application of Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

### 3. Trial Court's Failure to Remove Juror 30

Petitioner claims that the trial court deprived him of due process and a fair trial by failing to remove Juror 30 who could no longer be fair and impartial. (Pet. Ex. A at 46-47.)

///

44

The Court of Appeal also rejected this claim on appeal:

Defendant contends he was denied his right to a fair trial and an impartial jury when the court failed to conduct a more thorough examination of the jury following a derogatory comment he allegedly thought he heard and by failing to remove Juror Number 30 for cause after she expressed concerns about being harassed and possibly followed by a car full of male Hispanics.

### 1. Perceived Derogatory Comment

During the third week of trial, as the jurors were leaving the courtroom, defendant complained to counsel that he had heard a female voice whisper the word "murderer." Counsel informed the court and further stated that it may have been either Juror Number 21 or 30. The bailiff had also heard someone whisper something, although he asserted that the juror had made the comment to him, and that the innocuous comment was "see you tomorrow." Neither the defense attorney, nor the prosecutor, who were standing nearby, had heard anything.

The court stated that it would individually voir dire the female jurors the next day. The prosecutor commented that such voir dire may be more damaging than helpful and questioned the defendant's credibility. The court echoed comments regarding the bailiff's credibility and noted the possibility that further inquiry might cause the jury to speculative negatively; the court chose to reserve the matter.

The following day the court chose not to individually voir dire the jurors. Instead, the court made the factual finding that credited the bailiff's statement. The court noted that both the district attorney and defense counsel were in close proximity and did not hear anything. The court further noted that Jurors 21 and 30 had left much earlier, that defendant could not identify a particular juror as having made the statement, and credited the bailiff's observation that what was said at most was "see you tomorrow." Specifically, the court ruled as follows: "I am going to make a factual finding that the word 'Murderer' was not whispered to the defendant as he has stated. At best, the defendant, in my view, might have misinterpreted the statement, 'See you tomorrow.' Maybe the 'morrow' part… might have sounded like 'murderer,' but that is what I so find." No further objection or discussion occurred and, outside of a subsequent admonition to the jury, the matter was closed.

A trial court must conduct a sufficient inquiry to determine facts alleged as juror misconduct "whenever the court is put on notice that good

45

cause to discharge a juror may exist." (*People v. Burgener* (1986) 41 Cal.3d 505, 519, disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 753.) On this record, we cannot conclude that the trial court was put on notice of good cause to discharge the unknown juror. Accordingly, it did not err in refusing defendant's request to conduct an inquiry into whether the jury had prejudged the case.

Defendant merely speculates that there might have been jury misconduct. The trial court did not abuse its discretion in failing to interrogate the jurors about a purported comment that no one, other than defendant, heard. (See *People v. Nesler* (1997) 16 Cal.4th 561, 582 [trial court's "credibility determinations and findings on questions of historical fact" concerning juror misconduct upheld if based on substantial evidence].)

Accordingly, no duty arose on the part of the trial court to conduct an inquiry of the jury.

### 2. The "Fearful Juror"

Defendant next complains that the court should have removed Juror Number 30 after she complained that she was harassed by a person of "mixed race" at a market over the weekend and later might have been followed by a car full of Hispanic males. After conducting a thorough voir dire and assuring the juror that she was not in danger, the court elicited her repeated statement that she could perform her duty and would remain fair and impartial.

Defendant argues that the court had no choice but to conclude that the juror was biased because she expressed fear for her situation. The court, however, specifically asked Juror 30 if she could keep an open mind, perform her duties and be a fair and impartial juror.

Section 1089 permits the court to remove a juror for cause when the juror is unable to perform his or her duties. However, outside of the normal stress expressed by the juror in this type of case, and later echoed by the court and all of the jurors, there was no evidence that Juror Number 30 was in any way unable to perform her obligations. To the contrary, she repeatedly and credibly stated her ability to be fair and impartial.

On this record, there was no conceivable error by failing to excuse Juror Number 30.

(Op. at 33-36.)

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of

46

impartial jurors. U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotation marks omitted).

The Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. *Id.* Due process only means a jury capable and willing to decide the case solely on the evidence before it and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. *Id.* Such determinations may properly be made at a hearing. *Id.*

The state appellate court's rejection of this claim was not unreasonable. With respect to the first allegation that Juror 30 was biased based on a perceived derogatory comment, the trial court did not hold a hearing. *See supra* at 45. However, clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties. *Tracey v. Palmateer*, 341 F.3d 1037, 1045 (9th Cir. 2003); *see also Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005) (Supreme Court cases do not require that a trial court conduct a hearing sua sponte whenever presented with allegations of juror bias; court should consider content of allegations, seriousness of the alleged misconduct or bias, and credibility of the source, when determining whether a hearing is required). *Remmer v United States*, 347 U.S. 227 (1954), and *Smith v. Phillips*, 455 U.S. 209 (1982), do not stand for the proposition that any time evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias. *Smith* states that this "may" be the proper course, and that a hearing "is sufficient" to satisfy due process. *Tracey*, 341 F.3d at 1044 (citing *Smith*, 455 U.S. at 217, 218). *Smith* leaves open the door

as to whether a hearing is always required and what else may be "sufficient" to alleviate any due process concerns. *Id.*; *Tracey*, 341 F.3d at 1044-45 (concluding that state trial court's decision not to question juror further to obtain names of other jurors and to take additional testimony from them was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent). Under *Sims*, the court should consider content of allegations, seriousness of the alleged misconduct or bias, and credibility of the source, when determining whether a hearing is required. 414 F.3d at 1153. Here, the trial court considered foremost the credibility of the source, *i.e.*, Petitioner's claim that he heard a female juror whisper "murderer" versus the bailiff's report that the comment was "see you tomorrow." *See supra* at 45. The court also noted that neither the district attorney nor defense counsel heard anything. *Id.* Therefore, the trial court reasonably concluded that Petitioner's accusation was largely speculative as he could not identify who specifically made the statement and the content of the statement was not corroborated by anyone else nearby, including his own counsel. *Id.* In light of the highly speculative nature of the accusation and the concern that further inquiry might cause negative speculation by the jury, the trial court's decision not to hold a hearing was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See Tracey*, 341 F.3d at 1044-45. It follows that the state appellate court's rejection of this claim was not an unreasonable application of Supreme Court precedent. 28 U.S.C. § 2254(d).

The state appellate court's rejection of the second claim that recusal was appropriate due to Juror 30's express fear was also reasonable. In that instance, the trial court did hold a hearing. *See supra* at 46. A court confronted with a colorable claim of juror bias will generally conduct a hearing involving all interested parties to explore the issue of juror bias and provide the defendant an opportunity to prove actual bias. *See Hedlund v. Ryan*, 854 F.3d 557, 574 (9th Cir. 2017). This is the remedy provided by the Supreme Court. *Id.* (citing *Smith*, 455 U.S. at 215). And so long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness. *Id.* (state supreme court's

48

decision that trial court did not abuse its discretion in refusing to dismiss a juror who discovered she was distantly related to victim was not contrary to, nor an unreasonable application of clearly established Supreme Court precedent, where trial court held hearing and was reasonably satisfied that no actual bias was present).

During the hearing when the trial court questioned her, Juror 30 repeatedly stated that she could perform her duty and would remain fair and impartial. *See supra* at 46; (RT 1433-1437). There is no allegation that the hearing itself was not objective, and the record clearly shows that the trial court thoroughly explored Juror 30's fear and its effect on her ability to remain fair and impartial. *Id.* Accordingly, the trial judge's finding that Juror 30 was not biased is presumed correct. *Hedlund*, 854 F.3d at 574. It follows that the state appellate court reasonably rejected this claim and in doing so, did not unreasonably apply Supreme Court precedent. 28 U.S.C. § 2254(d).

### 4. Prosecutorial Misconduct

Petitioner claims that the prosecutor's reference to his in-court demeanor amounts to prosecutorial misconduct and impinged on his right not to testify.

The Court of Appeal rejected this claim on appeal:

> Defendant next contends the prosecutor committed misconduct by asking a witness questions about defendant's demeanor during the preliminary hearing testimony of victim Mendoza, and by commenting on that evidence during closing argument. In a related claim, he asserts that his counsel rendered ineffective assistance of counsel by failing to object to the purported misconduct during closing argument.

> *1. Background*

> At trial, during the prosecutor's opening statement, defendant started to shake his head "no" when the prosecutor called him a murderer. Upon seeing defendant's behavior, the trial court excused the jury and admonished defendant that his nonverbal conduct was inappropriate.

> Shortly after the court's warning, the prosecution called Casillas's sister, Rebecca Navarro. The prosecutor asked Navarro about Mendoza's preliminary hearing testimony and whether she could see if defendant was "doing something" during Mendoza's testimony that appeared to be

49

directed at Mendoza.  Defense counsel objected on relevancy and foundational grounds, which the court overruled.  Navarro stated that defendant was "smirking and smiling" at Mendoza as she testified at the preliminary hearing.

Then once Mendoza took the stand at trial and began to testify, defendant started to shake his head "no."  Outside of the presence of the jury, the court re-admonished defendant about his inappropriate behavior, ordering him to "[c]ease, stop, [and] desist," or else the court would deem defendant to be waiving his right to remain silent and would put defendant on the witness stand.  Once the jury was brought back into the courtroom, Mendoza continued with her testimony.

Mendoza testified that defendant smiled and smirked at her during the preliminary hearing.  Also, a woman in the audience mouthed the word "bitch" at Mendoza and other "foul things," that upset Mendoza as she testified.  Mendoza said she was scared when she testified at the preliminary hearing.

During the prosecutor's closing argument, he stated, "[y]ou have seen the defendant in this court over the course of this trial.  You have seen him every day.  He looks scared.  I would be scared too if I were facing a conviction of murder."  Defendant counsel's objection to these statements was overruled.  Later, in closing argument, the prosecutor said, "What about the defendant's conduct during Janett [Mendoza's] testimony at the preliminary hearing where he is smiling and smirking at Janett during her testimony in an attempt to intimidate her?  That is not what an innocent person would do.  It's like he was taunting her."  Defendant counsel did not object.

### 2. *Comments About Defendant's Demeanor*

"A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact."  (*People v. Avila* (2009) 46 Cal.4th 680, 711 [applying both federal and state standards].)  The Attorney General contends defendant forfeited his claims of misconduct by failing to object on the asserted grounds at trial.

It is well-settled that a claim of prosecutorial misconduct is generally reviewable on appeal only if the defense makes a timely objection at trial and asks the trial court to admonish the jury to disregard the prosecutor's question.  (*People v. Sapp* (2003) 31 Cal.4th 240, 279.)  A defendant's failure to object or request an admonition is excused if either would be

futile or an admonition would not have cured the harm caused by the misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 820; *People v. Earp* (1999) 20 Cal.4th 826, 858.)

Defendant acknowledges defense counsel failed to object to the prosecutor's additional comments or request admonitions to any other aspect of rebuttal argument. He asserts that raising an objection or requesting an admonition would have been futile given the fact that the trial court had overruled the prior objections. Alternatively, defendant argues defense counsel was prejudicially ineffective for failing to object and request such admonitions to the rebuttal argument. We will therefore address defendant's arguments on the merits given his claim of ineffective assistance. (*People v. Williams* (1998) 61 Cal.App.4th 649, 657.)

Defendant contends that the prosecutor committed misconduct by eliciting testimony about his demeanor at the preliminary hearing and during closing argument by commenting about this demeanor. Defendant is correct that a prosecutor may not comment on a nontestifying defendant' demeanor or behavior during the guilt phase. (See e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 434; *People v. Heishman* (1988) 45 Cal.3d 147, 1960197.) Here, however, the prosecutor did not comment on defendant's behavior at trial, but his demeanor at the preliminary hearing as Mendoza was testifying. This evidence was relevant to the jury's assessment of Mendoza's credibility both at the preliminary hearing and at trial. Evidence Code section 780 provides in pertinent part: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness *any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing*…." (Italics added.) Here, evidence of defendant's behavior served to bolster Mendoza's credibility with respect to her identification of defendant as the shooter. Even as she was taunted by defendant and his supporters, Mendoza remained steadfast in her identification of defendant. The prosecutor did not suggest the jury should convict defendant based on his courtroom demeanor. Rather, the prosecutor focused on Mendoza's credibility.

To the extent the prosecutor's comment that defendant looked "scared" implied a consciousness of guilt, this comment was improper. But given the overwhelming evidence of defendant's guilt, he is not entitled to relief based on this stray comment under the applicable federal or state standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Finally, defendant also contends that the prosecutor's comments improperly highlighted his exercise of his constitutional right to remain silent in the face of criminal charges (*Griffin v. California* (1965) 380 U.S.

609, 615), but nothing in the prosecutor's comments either directly or indirectly implicated the decision not to testify. (E.g., *People v. Combs* (2004) 34 Cal.4th 821, 866-867.)

"When, as here, the point focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072 overruled on another point in *People v. Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.) On the record here, the answer is no.

(Op. at 36-39.)

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005); *see also Deck v. Jenkins*, 814 F.3d 954, 978 (9th Cir. 2016) (recognizing that *Darden* is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes). A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995); *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

Respondent first argues that this claim is procedurally defaulted because Petitioner failed to object to the prosecutorial misconduct at trial. (Ans. at 34.) Respondent is correct that a petitioner who fails to observe a state's "contemporaneous objection" rules

may not challenge the constitutionality of the conviction in federal court. *See Engle v. Isaac*, 456 U.S. 107, 129 (1982); *United States v. Frady*, 456 U.S. 152, 162-169 (1982) (while plain error applies in determining whether a defendant may raise a claim for the first time on direct appeal, cause and prejudice standard applies in determining whether that same claim may be raised on habeas). However, a petitioner is not barred and therefore does not have to show cause and prejudice when a reviewing state court overlooks the procedural default and considers the claim on the merits. *See Thomas v. Hubbard*, 273 F.3d 1164, 1176 (9th Cir. 2002) (holding that alleged procedural default was no bar to claim where state court addressed procedural default issue but left resolution of the issue uncertain, failing to make a clear and express statement that its decision was based on a procedural default); *Walker v. Endell*, 850 F.2d 470, 474 (9th Cir. 1987) (relying on *Engle* to find that review on the merits for plain error by a state appellate court negates the defendant's procedural default), *cert. denied*, 488 U.S. 926, 981 (1988). Accordingly, because the state appellate court went ahead and addressed the merits of this claim, Petitioner is not barred from having this Court consider it on the merits. *See also Ylst*, 501 U.S. at 801.

The state appellate court's rejection of this claim was not unreasonable. First of all, the prosecution's statements did not improperly refer to Petitioner's failure to testify at trial. Rather, the prosecution's comments only referred to Petitioner's demeanor at the preliminary hearing during Mendoza's testimony, which served to bolster her credibility with respect to her identification of Petitioner as the shooter, as the state appellate court observed: "[e]ven as she was taunted by defendant and his supporters, Mendoza remained steadfast in her identification of defendant." *See supra* at 51. The state appellate court reasonably found that the prosecution did not improperly suggest that the jury should convict Petitioner based on his courtroom demeanor, but rather focused on Mendoza's credibility. *Id.* Although the state appellate court determined that the prosecution's comment that Petitioner looked "scared" was improper, it reasonably concluded that the stray comment did not entitle him to relief given the overwhelming evidence of his guilt.

*Id.* In other words, it cannot be said that this single improper statement "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson*, 63 F.3d at 929. Accordingly, the state court's rejection of this claim was not contrary to or an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

## 5.     Limiting Examination of Expert Witness

Petitioner claims that the trial court abused its discretion and violated his right to due process and to present a complete defense when it foreclosed defense counsel from asking his eyewitness identification expert questions concerning the photographic display shown to Mendoza. (Pet. Ex. A at 49.)

The Court of Appeal rejected this claim on appeal:

> Defendant contends his murder conviction must be reversed because the trial court erred when it limited the testimony of Dr. Shomer. He adds that the error deprived him of his constitutional right to present a defense. Defendant further claims that his trial counsel was ineffective for failing to move to suppress Mendoza's in-court identification and for failing to adequately prepare Dr. Shomer.

> *1.     Expert Testimony*

> During cross-examination of Dr. Shomer, the prosecutor asked him about what he did to evaluate the eyewitness identification in the instant case. Specifically, the prosecutor asked Dr. Shomer if he had reviewed Mendoza's videotaped interview and if he had read an excerpt of the transcript of that interview. Dr. Shomer replied that he had neither watched the videotape nor read the transcript. The prosecutor then asked Dr. Shomer if he had looked at the photo lineup in the case. Dr. Shomer explained that he had "not had a chance" to look at the photo lineup in this case. On redirect examination, defense counsel requested to show the photo lineup to Dr. Shomer. The court ruled that counsel could ask general questions about photo lineup procedures, but could not ask specific questions about the photo lineup used in this particular case.

> A defendant has a right to present testimony of witnesses in his defense, subject to the condition that "a state court's application of ordinary rules of evidence – including the rule stated in Evidence Code section 352 – generally does not infringe upon this right." (*People v. Cornwall* (2005) 37

54

Cal.4th 50, 82, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  Due process does not require that a court allow an accused to present evidence in the exact form, manner, and quantum the defense desires, and may properly preclude its use pursuant to Evidence Code section 352.  (See *People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

When a defendant on appeal challenges a trial court's evidentiary rulings in the context presented by defendant here, a reviewing court applies well-settled standards of review: "[T]he decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion." (*People v. McDonald* (1984) 37 Cal.3d 351, 377 (*McDonald*), overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.) Accordingly, a trial court may allow expert testimony that "informs the jury of certain factors that may affect such an identification in a typical case," while at the same time limiting such "to explaining the potential effects of those circumstances on the powers of observation and recollection of a typical eyewitness." (*McDonald*, *supra*, at pp. 370-371.)  In other words, a trial court may properly exclude expert testimony that potentially takes over the jury's task of judging credibility by telling the "jury that any particular witness is or is not truthful or accurate in his identification of the defendant." (*Id.* at p. 370.)

Here, the trial court implicitly ruled that it was for the jury to decide, based on the factors described by Dr. Shomer, whether the photo lineup utilized in this case was problematic.  We see no more in defendant's case than a proper application of *McDonald*-like parameters on an expert's testimony.  The court did not severely restrict defendant's expert witness or otherwise preclude defendant from presenting a defense.  Rather, the court did no more than preclude defendant's expert from directly telling the jurors how they were supposed to view the six-pack photo lineup.  There was no error. (*McDonald*, *supra*, 37 Cal.3d at pp. 370-371.)

(Op. at 12-14.)

The constitutional right to present a complete defense includes the right to present evidence, including the testimony of witnesses.  *See Washington v. Texas*, 388 U.S. 14, 19 (1967).  But the right is only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense." *Id.* at 16.  Additionally, a violation of the right to present a defense does not occur any time such evidence is excluded, but rather only when its exclusion is "arbitrary or disproportionate to the purposes [the exclusionary rule applied is] designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)

United States District Court
Northern District of California

(internal citation and quotation marks omitted); *Michigan v. Lucas*, 500 U.S. 145, 151 (1991).

To determine whether the excluded evidence is relevant and material, and vital to the defense, the court may consider the following factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *See United States v. Stever*, 603 F.3d 747, 755-56 (9th Cir. 2010) (quoting *Miller v. Stagner*,[3] 757 F.2d 988, 994 (9th Cir. 1985)).

Respondent first asserts that it is questionable whether this claim goes beyond one of state law. (Ans. at 39.) Even assuming the claim is cognizable on federal habeas, Respondent asserts that discretionary determinations are an example of the kind of general rules that is afforded particularly wide deference on habeas review, and that the state court's rejection of this claim was not unreasonable. (*Id.* at 39-40.)

Assuming the claim is cognizable and weighing the *Miller* factors, the Court finds that the limitation on Dr. Shomer's testimony did not violate Petitioner's right to due process or right to present a defense.[4] Petitioner's defense at trial was mistaken identity, making identity the central issue for his defense. Applying the first *Miller* factor, the

---

[3] The *Miller* balancing test, however, is a creation of circuit law and, consequently, is not "clearly established law" for purposes of habeas corpus review under 28 U.S.C. § 2254(d)(1). *See Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009). Thus, because the Supreme Court has considered whether an evidentiary rule, by its own terms, violated a defendant's constitutional right to present evidence, but has not directly considered whether a trial court's exercise of discretion to exclude evidence, under a constitutionally sound evidentiary rule, violated a defendants' constitutional right to present evidence, a state court's failure to apply the *Miller* balancing test, as in the case at bar, is not contrary to or an unreasonable application of clearly established Supreme Court precedent. *See id.* at 758-59.

[4] This consideration assumes that had Dr. Shomer been shown the photo lineup, he would have been willing to give an opinion on it, which is unlikely considering that he testified at trial that he was not there "to give any conclusion about who is right or wrong or the effects of how any one in particular reacts to a situation.... I am not evaluating [the evidence].... I am here simply to provide information about how these processes have been found to work...." *See supra* at 27.

56

probative value of Dr. Shomer's testimony on the photo lineup was likely low on the issue of identify, since his opinion on it would have no impact on Mendoza's positive in-court identification of Petitioner as the shooter. Considering the second factor, the reliability of Dr. Shomer's testimony is difficult to measure since he would only be offering an opinion, and it was for the jury to decide how much weight to give it. Thirdly, whether Dr. Shomer's testimony on the photo lineup was capable of evaluation by the jury was low because of the very concern that his expert testimony would potentially take over the jury's task of judging the credibility of Mendoza's identification. With respect to the fourth factor, Dr. Shomer's testimony regarding the photo lineup was certainly not the sole evidence on the issue of identify since he was nevertheless permitted to testify on the many factors that may affect eyewitness identification for the jury to consider. Lastly, it cannot be said that Dr. Shomer's testimony on the photo lineup constituted a major part of Petitioner's defense, where Dr. Shomer gave lengthy testimony in all other respects and Petitioner had alibi witnesses at trial. Considering that these factors weigh heavily against Petitioner, it cannot be said that the limitation on Dr. Shomer's testimony with respect to the photo lineup violated Petitioner's due process right to a fair trial or right to present a defense. *See Stever*, 603 F.3d at 755-56.

Even if an evidentiary error is of constitutional dimension, the court must consider whether the error was harmless under *Brecht*, 507 U.S. 619 (1993). *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001). In other words, the Court must consider whether the exclusion of this evidence had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 637. Here, Petitioner has failed to show how the jury's verdict would have been different but for this limitation on Dr. Shomer's testimony. As discussed above, the Court found no merit to Plaintiff's challenge to the eyewitness identification evidence because Mendoza's identification was sufficiently reliable to outweigh any corrupting effects of a suggestive photo lineup and was therefore admissible. *See supra* at 24-26. Therefore, even had Dr. Shomer been permitted to give an opinion on the photo lineup and the jury had been persuaded to

disregard it, it cannot be said that the jury would have reached a different verdict in light of other identification evidence: Mendoza's physical description of the shooter (before she was shown the photo lineup) fit the description of Petitioner, and her in-court identification of Petitioner as the shooter at trial was absolute. *Id.* at 23. In light of the other strong evidence identifying Petitioner as the shooter, it cannot be said that the limitation on Dr. Shomer's testimony with regards to the photo lineup had a substantial and injurious effect or influence on the jury's verdict. *See Brecht*, 507 U.S. at 637.

Based on the foregoing, the state court's rejection of this claim was not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

### 6. Cumulative Prejudice

Petitioner's final claim is cumulative prejudice. (Pet. Ex. A at 54.) The California Court of Appeal rejected this claim: "Because we conclude defendant has failed to establish any prejudicial error, there was no cumulative prejudice to him. (*People v. Riel* (2000) 22 Cal.4th 1153, 1215 [rejecting cumulative error argument where the[re] was 'no error that, even in cumulation, was prejudicial'].)" (Op. at 39.)

It has been held that in some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).

The Court has found that none of the claims discussed above have merit. Accordingly, Petitioner has failed to show cumulative prejudice to warrant federal habeas relief. *See Hayes*, 632 F.3d at 524. The state court's rejection of this claim was not

contrary to or an unreasonable application of Supreme Court precedent.  28 U.S.C. § 2254(d).

## IV.  CONCLUSION

After a careful review of the record and pertinent law and finding none of the claims have any merit, the Court concludes the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions as moot, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED**.

Dated: April 25, 2019

BETH LABSON FREEMAN
United States District Judge